UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ROBERT TOLLIVER,**

     **Plaintiff,**

**v.**                                                    **Case No. 8:13-cv-00280-DNF**

**COMMISSIONER OF SOCIAL
SECURITY,[1]**

     **Defendant,**

_____/

### OPINION AND ORDER

     This cause is before the Court on Plaintiff's Complaint (Doc. 1) filed on January 30, 2013.

Plaintiff Robert Tolliver seeks judicial review of the final decision of the Acting Commissioner of

the Social Security Administration ("SSA") denying his claim for Supplemental Security Income

Benefits.  The Commissioner filed the Transcript of the proceedings (hereinafter referred to as

"Tr." followed by the appropriate page number), and the parties filed legal memoranda in support

of their positions.  For the reasons set out herein, the decision of the Commissioner is **AFFIRMED**

pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

     **I.  Social Security Act Eligibility, the ALJ Decision and Standard of Review**

     **A. Eligibility**

     The law defines "disability" as "the inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

result in death or has lasted or can be expected to last for a continuous period of not less than 12

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the Defendant in this suit. FED. R. CIV. P. 25(d). No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

months." 42 U.S.C. §§ 416(i), 423(d)(1)(A), 1382a(3)(A); 20 C.F.R. §§ 404.1505, 416.905.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382a(3); 20 C.F.R. §§ 404.1505 - 404.1511, 416.905 - 416.911.  Plaintiff bears the burden of persuasion through step four, while at step five the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987).

### B.  Procedural History

On March 3, 2010, Plaintiff filed an application for Supplemental Security Income Benefits asserting a disability onset date of May 19, 2004. (Tr. 21, 74-75, 117-19).  These claims were denied initially on June 30, 2010, and denied upon reconsideration on August 25, 2010. (Tr. 21, 74-75, 85-86).  A hearing was held before Administrative Law Judge, Michael S. Maram (hereinafter "ALJ") on August 4, 2011. (Tr. 21, 41-65). The ALJ issued an unfavorable decision on September 7, 2011. (Tr. 18-34).  On December 5, 2012, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 1-3).  The ALJ's decision is the final decision of the Commissioner of Social Security in the present case. Plaintiff now seeks judicial review of the ALJ's decision in the United States District Court for the Middle District of Florida.

### C.  Summary of the ALJ's Decision

The ALJ found that Plaintiff "has not been under a disability within the meaning of the Social Security Act since March 3, 2010, the date the application [for supplemental insurance benefits] was filed." (Tr. 21, 34).  At step one of the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 3, 2010, Plaintiff's application date for supplemental insurance benefits. (Tr. 23).  At step two, the ALJ found that the plaintiff suffered from the following severe impairments: "multiple sclerosis (MS),

diabetes mellitus, major depression, a history of alcohol abuse, and hypertension." (Tr. 23). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (Tr. 28-29).

At step four, the ALJ found that Plaintiff has the Residual Functional Capacity ("RFC") to perform a limited range of light work. (Tr. 29). The ALJ found that, in his work, Plaintiff needs to alternate from sitting to standing, as well as to work in a temperature-controlled environment where the Plaintiff will not be exposed to direct sunlight, gases, fumes, pollutants and other toxins. (Tr. 29). The ALJ also found that Plaintiff must not engage in repetitive bending and stooping, must not perform climbing, driving, or working with heights, and must not work with industrial hazards or dangerous machinery. (Tr. 29). Furthermore, the ALJ found that, due to Plaintiff's mental impairment, Plaintiff has moderate limitations in social functioning and concentration and cannot perform complex, detailed tasks. (Tr. 29). The ALJ also found that Plaintiff cannot performing any jobs that are not low-stress in nature described as devoid of stringent production goals. (Tr. 29). However, according to the ALJ's ruling, the Plaintiff is capable of performing simple, routine, repetitive tasks defined as unskilled work and at the lower end of the semi-skilled occupational base. (Tr. 29).

In light of Plaintiff's symptoms, the ALJ then introduced a two-step inquiry which the ALJ is required to follow: first, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce [Plaintiff's] pain or other symptoms"; second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the [Plaintiff's] symptoms to determine the extent to which they limit the [Plaintiff's] functioning." (Tr. 29-30). The ALJ did not explicitly address the first step in this

inquiry but proceeded directly to the second step; accordingly, it is presumed that Plaintiff satisfactorily met the first step. (Tr. 30). Regarding the second step, however, the ALJ did not find the Plaintiff's claims concerning the intensity, persistence, and limiting effects of these symptoms were credible because they were inconsistent with the medical evidence of record. (Tr. 30). Thus, while the ALJ found the Plaintiff was not able to perform his past relevant work, the ALJ found that Plaintiff was capable of performing "substantial gainful activity on a sustained basis." (Tr. 32).

At step five, considering the Plaintiff's age, education, work experience, and RFC, the ALJ determined there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed pursuant to 20 C.F.R. §§ 404.969, 404.969(a). (Tr. 32-33). Therefore, the ALJ found that a finding of "not disabled" was appropriate. (Tr. 32).

### D. Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standard, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. §405(g). Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if

the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II. Review of Facts

### A. Background Facts and Medical Evidence

Plaintiff was born on July 9, 1965, and was forty-six (46) years old on the date of the hearing. (Tr. 21, 143). At the hearing, Plaintiff stated that he completed the 9th grade of school, (Tr. 49), but in filling out his Disability Report, Plaintiff asserted that he completed the 11th grade.[2] (Tr. 177). He resides with his girlfriend, Ellen Hines. (Tr. 42). Prior to being diagnosed with MS, Plaintiff was employed as a painter of an apartment complex (Tr. 50, 154, 218); a dishwasher at a TGIF restaurant (Tr. 155, 178, 218); a fry cook at a Popeye's fast food restaurant (Tr. 153, 178, 218); and, according to his testimony at the hearing, as a cabinet assembler at Bay City Plywood.[3] (Tr. 45). Plaintiff then worked at the Hillsborough County Car Auction where his responsibilities included "writing up cars, parking cars." (Tr. 44-45, 151, 178, 218). Plaintiff testified that he left his employment with Hillsborough County Car Auction upon being diagnosed with MS. (Tr. 45).

On March 16, 2004, Plaintiff was admitted to the University Community Hospital of Tampa, Florida, complaining of numbness of the right arm and neck pain. (Tr. 231). The admitting physician, Dr. Humayun Mian, assessed that the Plaintiff was experiencing probable

---

[2] In Dr. Lawrence N. Pasman's Mental Status Evaluation of Plaintiff on May 24, 2010, Dr. Pasman asserted that Plaintiff reported to him that Plaintiff left school after the 10th grade. (Tr. 401).
[3] Plaintiff asserted in his Work History Report for the Social Security Administration that he delivered cabinets while making no mention of assembling cabinets. (Tr. 152).

demyelinating disease in the form of MS, right motor sensory paresis secondary to the MS, and right carotid bruit. (Tr. 233). Dr. Mian thereafter referred Plaintiff to Dr. Shrinath Kamat. (Tr. 231).

On May 17, 2004, Plaintiff presented himself to Dr. Kamat who assessed that Plaintiff suffered from probable MS and right arm dysmetria secondary to MS. (Tr. 249). As a consequence of weakness in his right hand, Plaintiff stated that he could not go back to work due to an inability to coordinate his right hand. (Tr. 249). Otherwise, Plaintiff denied any new symptoms. (Tr. 249). At the time of the consultation, Dr. Kamat asserted that Plaintiff "remain[ed] temporarily disabled for any gainful employment." (Tr. 250). Dr. Kamat also prescribed Copaxone to Plaintiff to treat his MS. (Tr. 250).

On July 8, 2004, Plaintiff presented himself to Dr. Kamat for a follow-up appointment. (Tr. 247). Dr. Kamat once again assessed that Plaintiff suffered from probable MS and right arm dysmetria, but also included fatigue due to the dysmetria, abnormal LFTs, and hyperlipidemia in his diagnosis. (Tr. 247). At the time of the consultation, Plaintiff stated that he had not begun taking the prescribed Copaxone because he had not yet received the medication in the mail. (Tr. 247). Plaintiff complained of numbness in his right arm and hand, causing difficulty in coordinating his right arm. (Tr. 247). Plaintiff also complained of periodic headaches, loss of appetite, fatigue, unsteadiness, and depression. (Tr. 247). Dr. Kamat advised Plaintiff to immediately begin to take the prescribed Copaxone, and Dr. Kamat also prescribed Prozac to Plaintiff for his depression. (Tr. 250). Dr. Kamat instructed Plaintiff to abstain from drinking alcohol. (Tr. 247). Dr. Kamat asserted that Plaintiff "continue[d] to remain temporarily disabled for his work." (Tr. 250).

In the hearing before the ALJ, Plaintiff testified that, after he was diagnosed with MS and his other ailments in 2004, he was incarcerated for five-and-one-half years for "unlawful sex with a minor." (Tr. 50). Plaintiff further testified that, during his incarceration, he was given a shot of Benadryl every day to treat his multiple sclerosis.[4] (Tr. 51).

On February 11, 2009, while incarcerated, Plaintiff was transferred from the Pinellas County Jail to the Bureau of Prisons. (Tr. 281). In the transfer report, the prison Health Services noted Copaxone and Glatiramer Acetate as Plaintiff's active medications. (Tr. 281). On February 18, 2009, Plaintiff reported joint pain, low back pain, shoulder pain, numbness, constipation and anxiety to the prison Health Services. (Tr. 287-301). On December 23, 2009, Plaintiff reported swelling and itching in his hands and feet. (Tr. 260). He was diagnosed with allergic urticarial, and the medications Triamcinolone and Methylprednisolone were prescribed. (Tr. 261). On February 24, 2010, Plaintiff was transferred to Gaston Correctional for probation. (Tr. 252). The medical problems noted at that time include the following: chronic MS, chronic constipation, chronic hypertension, and acute allergic urticarial. (Tr. 252).

On March 19, 2010, Plaintiff's girlfriend, Ellen Hines, completed a third-party function report. (Tr. 167-174). In that report, Ms. Hines asserted the following. Plaintiff's daily activities consisted of lying around the house because it was too stressful for Plaintiff to work. (Tr. 167). Plaintiff could not hold things in his hand, could not stand, and could not go out in the sun. (Tr. 168). Plaintiff did not sleep at all, lay awake at night in pain, was tired all of the time, and had muscle weakness. (Tr. 168). Plaintiff could not button his shirt, could not stand in the shower because he was too weak, couldn't hold a razor to shave himself, couldn't hold a sandwich with his right hand, had problems staying alert, and had problems preventing mood swings. (Tr. 168).

---

[4] Plaintiff's medical transfer from the Pinellas County Sherriff's Office on February 2, 2009 to the Bureau of Prisons lists Copazone and Glatiramer Acetate as Plaintiff's active medications. (Tr. 281).

Plaintiff needed help every day in attending to his personal needs and grooming, couldn't prepare his own meals because his medical conditions required that he avoid heat, lacked concentration, and couldn't stand on his feet too long. (Tr. 169). Plaintiff wasn't able to complete any household chores because of the inability to grip anything with his hands due to them being cold and numb. (Tr. 170). Plaintiff only left the house to go to his doctor's appointments, and he had to be driven to those appointments by another. (Tr. 170). Plaintiff couldn't shop for himself and couldn't adequately grip the money due to his medical condition. (Tr. 170-71). Plaintiff didn't have any hobbies and only watched television because he was depressed and in pain. (Tr. 171). Plaintiff cried at night because of the physical and emotional pain he was experiencing. (Tr. 171). Plaintiff didn't get along with family and friends because he was depressed, and Plaintiff felt like less than a man because he couldn't take care of himself. (Tr. 172). Plaintiff struggled to follow written instructions because of an inability to concentrate, and the stress of his condition was too great for him to handle. (Tr. 172). According to Ms. Hines, Plaintiff was let go from his auto auction job because his medical condition would not allow him to do any heavy lifting or work in the sun. (Tr. 173). Plaintiff also had a fear of going outside and a fear of being away from home too long. (Tr. 173). In sum, Ms. Hines stated that Plaintiff didn't sleep well, was tired all of the time, couldn't hold things in his hand properly, was depressed, was sometimes lonely, was angry because of his condition, and was afraid that his condition would only get worse. (Tr. 174).

On April 2, 2010, Plaintiff presented himself to the Lee Davis Health Clinic to request medication for his MS.[5] (Tr. 332). The clinic report noted that Plaintiff drank "a few beers for the past 20 years." (Tr. 332). In addition, Plaintiff reported muscle and joint aches from his MS and arthalgias. (Tr. 333). However, the clinic report's physical findings established that Plaintiff's

---

[5] The clinic report noted that his medication request was for muscular "dystrophy."

physical musculoskeletal status was normal. (Tr. 334). A referral was given to a neurologist as well as a prescription for Copaxone, and the following lab tests were ordered: Screen Malig Neoplasm Prostate, Screen Lipod Disorder, and Screen Iron Deficiency Anemia. (Tr. 334-35).

On April 21, 2010, Plaintiff again presented himself to the Lee Davis Health Clinic to review and discuss the lab tests that had been previously ordered. (Tr. 336). Plaintiff asserted at that time that he was having difficulty obtaining his Copaxone prescription from Hillsborough County Insurance, and he also stated that he was having problems starting and maintaining an erection. (Tr. 336). The clinic report noted that Plaintiff had poor exercise habits and stated that Plaintiff's goal was to begin regular exercise. (Tr. 336, 440). The clinic report also noted that Plaintiff was not experiencing any musculoskeletal issues or any other symptoms, while his physical musculoskeletal status remained normal. (Tr. 337-38). At that time, Plaintiff was assessed with hyperlipidemia, impaired fasting glucose, and a sexual disorder. (Tr. 338). Plaintiff was prescribed Simvastatin for the hyperlipidemia and Viagra for the sexual disorder. (Tr. 340). In addition, lab tests were ordered for Testosterone to address the sexual disorder and CMP for the Impaired Fasting Glucose. (Tr. 340).

On May 7, 2010, Plaintiff returned to the Lee Davis Health Clinic to discuss the results from the lab tests ordered during his last visit to the clinic and to request a different medication for the sexual disorder. (Tr. 341). At the time of visit, Plaintiff was experiencing no symptoms and Plaintiff's physical musculoskeletal status remained normal. (Tr. 341-42). Plaintiff was assessed with Diabetes Mellitus and was prescribed Metformin HCI and the TrueTrack Smart System Kit. (Tr. 340). In addition, Plaintiff was prescribed Levitra for the sexual order. (Tr. 340).

On May 24, 2010, Plaintiff presented himself to psychologist Dr. Lawrence N. Pasman for a clinical interview and mental status examination upon referral by the Office of Disability

Determinations. (Tr. 400). Plaintiff reported that he was driven to the office visit by Ms. Hines, and Ms. Hines assisted him in completing the intake form due to his reported difficulty with writing. (Tr. 400). With regards to his symptoms, Plaintiff stated that he had "[n]o feelings and numbness in [his] hands…ache[s] and pain in shoulder and back area…stress, tingling under the feet…mood swings…[he is] tired and restless all the time…[has] memory loss…shortness of breath…can't be in direct contact with the sun…[is] having problem[s] in [his] sexual mode…[is] always thirsty…slur[s] [his] speech…[is] not able to sit still…[his legs are] always shaking…[and his] hands are always cold." (Tr. 401). In addition, Plaintiff also reported numerous symptoms related to depression, including a diminished interest in pleasure, insomnia, and fatigue. (Tr. 401). Ms. Hines reported that Plaintiff drank a six-pack of beer nightly, though Plaintiff amended this statement to "a six-pack on three evenings a week." (Tr. 402).

With regards to Dr. Pasman's mental status examination of Plaintiff, Dr. Pasman reported that Plaintiff was fully oriented in all spheres, and he was well-groomed. (Tr. 402). Plaintiff experienced no memory problems for remote events, though Plaintiff did experience memory problems with regards to recent events. (Tr. 402). In addition, Plaintiff experienced no large gaps of memory and possessed no significant cognitive disturbances, though he did experience inconsistencies in concentration. (Tr. 402). Further, Plaintiff's gait and posture were unremarkable, Plaintiff's speech and language were clear and understandable, and he displayed no degree of conceptual disorganization, though it was noted that Plaintiff did experience personal difficulties with abstract concepts. (Tr. 402). Plaintiff's computational skills were deemed to be in the normal range, and Plaintiff reported no hallucinations or delusions. (Tr. 402-03). Finally, Dr. Pasman reported that Plaintiff experiences significant difficulty with impulse control, possesses a moderate degree of suspiciousness, and his behavior suggested deficits in judgment with regards to everyday

activities and social situations. (Tr. 402-403). Dr. Pasman diagnosed Plaintiff with Recurrent Moderate Major Depression, Alcohol Abuse, and R/O Depressive Disorder due to MS. (Tr. 404). Specifically, Dr. Pasman concluded that "[t[here is support for the presence of a Depressive Disorder closely related to his medical condition." (Tr. 403). In addition, Dr. Pasman reported that, with regards to Plaintiff's alcohol consumption, a Substance Abuse-Related Disorder seemed likely. (Tr. 404). Finally, Dr. Pasman reported, "[Plaintiff's] inconsistent concentration and significant problems with memory could be due to substance abuse, depression, or even the consequences of his medical condition." (Tr. 404).

On May 25, 2010, Plaintiff was referred by the Office of Disability Determinations to Dr. Todd K. Rosenthal. (Tr. 306-310). During the consultation, Plaintiff recounted his history of MS, including present numbness and weakness in his right hand, tingling in his feet and hands, and constipation from his MS medication. (Tr. 306). Dr. Rosenthal's report also stated that Plaintiff was diagnosed with Diabetes II three months previously, and Plaintiff did not know what his sugars were running. (Tr. 306). Plaintiff also complained of bilateral shoulder pain, pain on abduction both shoulders, and moderate pain when Plaintiff tried to lift his arms. (Tr. 306). Plaintiff also stated that he has been depressed since 2004, though Plaintiff did not feel like hurting himself and was sleeping well. (Tr. 306).

With regards to Plaintiff's physical examination with Dr. Rosenthal, Dr. Rosenthal reported that Plaintiff's blood pressure was 140/90, and Dr. Rosenthal observed Plaintiff to be alert and in no distress. (Tr. 307). Plaintiff's upper extremity examination was within normal limits, and there was no evidence of varicosity, edema, ulcers, or discoloration of the lower extremities. (Tr. 307). Plaintiff's pedal pulses were normal. (Tr. 307). Plaintiff demonstrated full range of motion without tenderness of the cervical spine, though Plaintiff did have a decreased range of motion in

his shoulders. (Tr. 307). Examination of Plaintiff's elbows, wrists and hands were within normal limits, while the rest of Plaintiff's upper extremity strength was 5/5 bilaterally. (Tr. 307). Further, examination of Plaintiff's thoracic and lumber spine, ankles, knees and feet, and reflexes were all deemed normal. (Tr. 307). Plaintiff's gait was normal, and Plaintiff did not require an assisted device. (Tr. 307). Dr. Rosenthal assessed Plaintiff with MS, diabetes II, depression, constipation, osteoarthritis of the shoulders, and weakness of the right hand. (Tr. 308).

On June 18, 2010, Plaintiff presented himself to neurologist Dr. Anoop K. Reddy for an evaluation of his MS. (Tr. 381). Plaintiff reported his symptoms as numbness in his hands, poor balance, and slurred speech. (Tr. 381). Plaintiff further reported that he had been taking Copaxone for his MS, had stopped taking the medication for a short time after being released from jail, but had begun taking it again. (Tr. 381). Finally, Plaintiff stated that he drank four beers a day but denied any history of substance abuse. (Tr. 381). Dr. Reddy noted that Plaintiff had a history of diabetes, ED, dyslipidemia, and depression. (Tr. 381). Dr. Reddy assessed Plaintiff with MS with no exacerbations or remissions of the disease. (Tr. 381). Dr. Reddy found it appropriate to continue Plaintiff on Copaxone, while also ordering a visual evoked response and an MRI of Plaintiff's brain. (Tr. 381).

On July 15, 2010, Plaintiff returned to the Lee Davis Health Clinic to discuss his diabetes treatment. (Tr. 345). Plaintiff stated that he had been taking his medication as prescribed but had not been checking his blood sugar every day because he did not know how to operate the machine. (Tr. 345). While at the clinic, Plaintiff was shown how to use the glucometer and denied any symptoms of hyper/hypoglycemia. (Tr. 345). The clinic report noted that Plaintiff drank a few beers a day and was not exercising regularly. (Tr. 345-46). The Plaintiff was assessed with hyperlipidemia and diabetes mellitus. (Tr. 347). For the diabetes mellitus, Plaintiff was prescribed

Metformin, referred to an opthalmologist and podiatrist, and instructed to complete lab tests. (Tr. 348). For Plaintiff's hyperlipidemia, Plaintiff was prescribed Simvastatin and instructed to complete a lipid panel lab test.[6]

On July 23, 2010, Plaintiff presented himself to neurologist Dr. Reddy for a follow-up visit to discuss the results of an MRI of Plaintiff's brain. (Tr. 282). Dr. Reddy reported that Plaintiff had "periventricular white matter changes that are non-enhancing." (Tr. 382). Upon examining Plaintiff, Dr. Reddy also noted that Plaintiff had "slight difficulty with tandem gait and he extinguishes to double simultaneous stimulation on the left. Otherwise, there is no gross neurological focality." (Tr. 382). Dr. Reddy assessed Plaintiff with probable MS and found it appropriate for Plaintiff to continue taking Copaxone. (Tr. 382).

On August 10, 2010, Plaintiff returned to the Lee Davis Health Clinic to discuss his lab results from his last visit to the clinic. (Tr. 350). Plaintiff stated that he had not been taking his medication as prescribed. (Tr. 350). Specifically, Plaintiff stated that he had not taken his medication once during the previous week. (Tr. 350). In addition, according to the clinic report, Plaintiff had not been following the diet plan recommended to him, while Plaintiff continued to use tobacco and alcohol. (Tr. 350). The clinic report also stated that Plaintiff, while overweight, displayed no noteworthy symptoms. (Tr. 351). For his diabetes mellitus, Plaintiff was instructed to continue taking the Metformin, and for his hyperlipidemia, Plaintiff was instructed to continue taking the simvastatin. (Tr. 353). Finally, Plaintiff was instructed to abstain from drinking alcohol and to begin regular exercise. (Tr. 353).

On September 23, 2010, Plaintiff presented himself to the Tampa Family Health Center to request a referral to a new neurologist and a prescription for cialisis. (Tr. 395). Plaintiff was

---

[6] The July 15, 2010 clinic report did not include a section designated for evaluation of Plaintiff's musculoskeletal symptoms or physical status. (Tr. 345-49).

assessed as suffering from MS and male erectile disorder. (Tr. 397). Plaintiff was also encouraged to maintain his appointment with neurologist Dr. Reddy. (Tr. 395).

On September 27, 2010, Plaintiff presented himself to neurologist Dr. Reddy. (Tr. 383). Dr. Reddy reported that there were no exacerbations of Plaintiff's symptoms, but Plaintiff complained of dull pain in his hands, shoulder joints, and feet, especially when he stands. (Tr. 383). Dr. Reddy noted that Plaintiff's complaints were atypical for a person who was suffering from MS. (Tr. 383). Finally, Dr. Reddy reported that Plaintiff's lower extremity somatosensory evoked potential was normal, but his visual evoked potential was abnormal. (Tr. 383).

On September 29, 2010, Plaintiff returned to Dr. Reddy with a list of medications Plaintiff was presently taking. (Tr. 384). Dr. Reddy reported that the results of a nerve conduction study displayed evidence of a mild early sensory peripheral neuropathy likely due to Plaintiff's diabetes. (Tr. 384). In addition, Dr. Reddy noted that Plaintiff suffered from "mild to at best moderate carpal tunnel syndrome" and "mild less like moderate cubital tunnel syndrome." (Tr. 384). Dr. Reddy then prescribed the following to Plaintiff: Gabapentin and bilateral wrist splints. (Tr. 384). Dr. Reddy also recommended that Plaintiff purchase soft elbow pads to protect his left elbow from further injury. (Tr. 384).

On November 8, 2010, Plaintiff presented himself for a follow-up appointment at the Tampa Family Health Center. (Tr. 390-94). During the evaluation, Plaintiff reported that he had a light heart attack on October 31, 2010 and was admitted to St. Joseph's Hospital. (Tr. 390). Plaintiff further stated that he had undergone placement of a cardiac stent and was prescribed Metropolol, Amlodipline and Plavix. (Tr. 390). Plaintiff also reported that on one occasion he had not taken his prescription medication during the previous week. (Tr. 390).

On November 11, 2010, Plaintiff returned to Dr. Reddy for a follow-up examination. (Tr. 385). Dr. Reddy reported that Plaintiff was fully functional despite his MS, and Dr. Reddy appreciated no significant neurological focality, if any. (Tr. 385). Plaintiff did complain of fatigue, and Dr. Reddy noted that Plaintiff's fatigue may be the result of his MS or other external factors. (Tr. 385). Dr. Reddy then prescribed Amantadine for Plaintiff's fatigue, was told to discontinue the Neurontin Plaintiff had been taking, and was encouraged to get wrist splints and soft elbow pads pursuant to Dr. Reddy's instructions during Plaintiff's September 29, 2010 visit with Dr. Reddy. (Tr. 385).

On February 25, 2011, Plaintiff presented himself to the Tampa Family Health Center for a follow-up appointment and to request a referral to a neurologist. (Tr. 387). Plaintiff reported that Dr. Reddy had been his neurologist, but Plaintiff had not seen Dr. Reddy in the past three months. (Tr. 387). Further, Plaintiff was told that he needed a referral to see a neurologist. (Tr. 387). Plaintiff also reported that he had not taken his medication on one occasion during the previous week. (Tr. 387).

During the August 4, 2011 hearing before the ALJ, Plaintiff testified that he was let go from his job because of his MS. (Tr. 45). Plaintiff also stated that he currently suffered from numbness in his hands, was always tired, experienced shortness of breath, and always itched. (Tr. 45). Plaintiff stated that he suffered from blisters on his feet when he stood for long periods of time, and he could not walk around the block without stopping because he would grow too tired. (Tr. 46). Plaintiff also could not stand in one place for five or ten minutes without sitting because his ankles would cramp up and feel as if they were about to give out from under him. (Tr. 46-47). Plaintiff would also experience tingling in his feet when he got up in the morning to go to the bathroom, which necessitated that Plaintiff would have to walk on the sides of his feet. (Tr. 47).

Plaintiff was also on medication for his diabetes which made him drowsy and required him to sit or lay down. (Tr. 47-48). However, for Plaintiff, sitting for any length of time is difficult as well because it hurts his behind. (Tr. 55). In fact, the Plaintiff was in pain after sitting for twenty minutes at the hearing. (Tr. 56). Because sitting can be difficult for Plaintiff, he mostly lays in bed. (Tr. 47). In addition, Plaintiff's heart disease made it harder for him to exert himself, do household chores, or go out in the community in fear that his heart problems would surface. (Tr. 47). When Plaintiff did go out, he would become very nervous, especially in crowded places like a grocery store, and Plaintiff would have to leave. (Tr. 48). As a consequence, Plaintiff's average day consists of sitting at home and looking out the window. (Tr. 57). Sometimes he would go to the doctor's office, and on Wednesday, he would go to a class. (Tr. 58). Plaintiff stated that he did not have any hobbies anymore and did not do anything for fun because of his condition. (Tr. 59). Plaintiff stated that he was basically unable to help out at home with the cooking and cleaning, had trouble buttoning his shirt, must drink out of paper cups in the event that he would drop the cup, and had difficulty reading and writing. (Tr. 60, 61). Plaintiff would only sleep about four hours total during the night and then had to take naps during the day. (Tr. 47). Plaintiff stated that he could probably lift twenty pounds but couldn't carry it because of the pain in his shoulders. (Tr. 57). Plaintiff further testified that his doctors told him to avoid lifting heavy objects. (Tr. 59). Plaintiff's doctors also told him to avoid the sunlight and prescribed splints for him to wear on his hands and wrists. (Tr. 59, 60).

Finally, during the aforementioned hearing, Joyce Courtright, a vocational expert, testified that Plaintiff's past work activity could be characterized as exertionally light to medium and unskilled to skilled, (Tr. 62), and Ms. Courtright opined that Plaintiff in his present condition could not return to any of his prior jobs. (Tr. 63). Ms. Courtright further testified that Plaintiff would be

able to work in assembly as a small products assembler; in wrapping and packing as a poly packer or heat sealer; and in verifying and recording such as a merchandise marker. (Tr. 63). In these jobs, Ms. Courtright testified that the competitive tolerance for absenteeism would be approximately ten to twelve days per year or one day per month. (Tr. 64).

### B. State Agency Evaluations

On June 29, 2010, Dr. Nancy Dinwoodie, a State Agency Disability Expert, determined that Plaintiff's alleged mental impairments, which included affective disorders and personality disorders, were not severe. (Tr. 318). Specifically, Plaintiff had mild limitations in activities of daily living, maintaining social functioning and in concentration, persistence, or pace. (Tr. 328). Plaintiff had not experienced an episode of decompensation. (Tr. 328).

On August 16, 2010, Dr. Ronald Kline, another State Agency Disability Expert, determined that Plaintiff could lift twenty pounds occasionally, ten pounds frequently, could stand and/or walk for about six hours in an eight-hour workday, could sit for about six hours in an eight-hour workday, and push or pull on an unlimited basis. (Tr. 356). In addition, Plaintiff could occasionally climb, balance, stoop, kneel, crouch or crawl. (Tr. 357). Furthermore, Plaintiff's ability to reach and handle were limited, while Plaintiff's ability to finger and feel was unlimited. (Tr. 358).

On August 24, 2010, Dr. Robert Schilling, a State Agency Disability Expert, determined that Plaintiff had mild restrictions in daily living and moderate restrictions in social functioning and in maintaining concentration, persistence, or pace. (Tr. 373). Dr. Schilling also opined that Plaintiff's ability to understand and remember complex or detailed instructions is limited, but Plaintiff could understand, remember, and carry out simple instructions. (Tr. 379). Plaintiff's basic memory processes revealed mild/moderate limitations, but Plaintiff could perform work in a stable environment. (Tr. 379). Further, Plaintiff might experience mild to moderate difficulties working

within a work schedule and at a consistent pace. (Tr. 379). Plaintiff would not be able to maintain

regular attendance to work and be punctual, though Plaintiff would not require special supervision

to maintain a work routine. (Tr. 379). Plaintiff should also have limited exposure to the general

public during episodes of exacerbated symptoms. (Tr. 379). Dr. Schilling concluded his report by

stating that Plaintiff "is able to meet the basic mental demands of competitive work on a sustained

basis despite the limitations resulting from any impairment." (Tr. 379).

### III)   Analysis and Conclusions of Law[7]

Plaintiff raises one issue on appeal. As stated by Plaintiff in his Memorandum in Support

of Plaintiff's Complaint (hereinafter, "Pl.'s Memo"), "The ALJ's decision that the [P]laintiff has

the residual functional mental capacity to perform a limited range of light work is not supported

by the weight of the evidence." (Pl.'s Memo 14).

Specifically, Plaintiff disagrees with the ALJ's finding that Plaintiff's statements

concerning his impairment and his impact on Plaintiff's ability to work were not entirely credible.

(Pl.'s Memo 16). Plaintiff asserts that, according to Social Security Ruling (hereinafter "SSR") 96-

7p, "An individual's statements about the intensity and persistence of symptoms or the effect of

the symptoms on his ability to work may not be disregarded merely because they are not

substantiated by medical evidence." (Pl.'s Memo 16-17). Plaintiff then highlights Plaintiff's

complaints of pain and numbness as substantiated by numerous medical doctors and Plaintiff's

girlfriend, Ms. Hines. (Pl.'s Memo 17). In this manner, Plaintiff argues that the medical evidence

---

[7] While Plaintiff isolates only this one issue in his Memorandum in Support of Plaintiff's Complaint, the following should be noted: under step 2 of the Social Security Administration's 5-step disability inquiry, Plaintiff was determined to have both severe mental and physical impairments; under step 3, however, the ALJ only addressed Plaintiff's mental impairments when determining whether Plaintiff's severe impairment met any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). This failure to address Plaintiff's physical impairments, however, constitutes "an implied finding that a claimant does not meet a [physical impairment] listing." *Hutchison v. Brown*, 787 F.2d 1461, 1463 (11th Cir. 1986) (citing *Edwards v. Heckler*, 736 F.2d 625, 629 (11th Cir.1984)).

supports the proposition that, due to his disability, Plaintiff is unable to engage in any gainful activity. (Pl.'s Memo 17).

Before addressing whether the ALJ's decision was supported by substantial evidence, it is first relevant to address Plaintiff's emphasis upon the above-mentioned passage from SSR 96-7p. The actual passage from SSR 96-7p reads as follows: "An individual's statements about the intensity and persistence of symptoms or the effect of the symptoms on his ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." (SSR 96-7p, 1996). Taken in isolation, it would appear that this passage precludes the ALJ from focusing solely upon Plaintiff's objective medical evidence to refute Plaintiff's statements of his symptoms. However, the statement preceding this passage reveals that the ALJ's emphasis in this case upon the Plaintiff's *credibility* in light of the objective medical evidence is perfectly in keeping with the intent of SSR 96-7p: "In determining the *credibility* of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." (Italics included) (SSR 96-7p). Indeed, in the present case, the ALJ did not "disregard" Plaintiff's statements but evaluated them in light of the objective medical evidence specifically towards determining the credibility of Plaintiff's statements. (*See* Tr. 30). The ALJ held, "Specifically, the undersigned finds that there are inconsistencies with the claimant's allegation of disabled symptomatology, and the objective medical evidence." (Tr. 30). Furthermore, with regards to the admonition in SSR 96-7p that the ALJ must not disregard Plaintiff's statements of his symptoms solely because they are not substantiated by objective medical evidence, it is crucial to note that the ALJ identified significant

gaps in Plaintiff's history of medical treatment as well as instances where Plaintiff reported problems with his speech, balancing, and other aspects of his person that are seemingly contradicted by the absence of any such problems as reported by medical doctors such as Dr. Pasman. (Tr. 30). In this manner, in considering both the objective medical evidence and gaps in such evidence, the ALJ did not "disregard" Plaintiff's statements of his symptoms based "solely" on the objective medical evidence. Thus, because the ALJ did not limit his determination solely to the objective medical evidence and because the ALJ did not disregard Plaintiff's statements but utilized the objective medical evidence and gaps in the medical record to isolate inconsistencies in Plaintiff's statements, the ALJ did not act contrary to SSR 96-7p.

The question then turns to whether or not the ALJ based his determination that Plaintiff was not disabled upon substantial evidence. As noted previously, substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote*, 67 F.3d at 1560. Furthermore, where the Commissioner's decision is supported by substantial evidence, the district court will affirm that decision, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes*, 932 F.2d at 1358.

Thus, the key determination is whether there exists such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote*, 67 F.3d at 1560. In this case, the ALJ presented substantial evidence to support his decision. As noted in the above, the ALJ considered Dr. Pasman's psychological evaluation where Dr. Pasman noted Plaintiff's gait and posture as unremarkable, Plaintiff exhibited no involuntary movements, his speech was logical

and coherent, Plaintiff exhibited no difficulty in establishing or maintaining emotional rapport, and Plaintiff denied experiencing suicidal ideations or homicidal ideations. (Tr. 30).

In addition, the ALJ discussed Dr. Rosenthal's evaluation of Plaintiff, where Plaintiff's upper extremity evaluation was within normal limits, there was no evidence of varicosity, edema, ulcers or discoloration of the lower extremities, and Plaintiff's pedal pulses were deemed normal. (Tr. 31). Furthermore, Plaintiff's range of motion with regards to his cervical spine was full with no tenderness, while an examination of his elbows, wrists and hands were within normal limits as was Plaintiff's thoracic and lumbar spine. (Tr. 31). Plaintiff's hips, ankles, knees, and feet were also within normal limits with strength at 5/5 bilaterally. (Tr. 31). Finally, Plaintiff's reflexes were normal bilaterally, his gait was normal as was his station, and he did not need an assistive device. (Tr. 31).

The ALJ also noted that, while Plaintiff claimed symptoms of a completely debilitative nature, his treating physician, Dr. Reddy, had placed no restrictions on Plaintiff. (Tr. 31). Indeed, during his evaluation of Plaintiff on November 11, 2011, Dr. Reddy stated that Plaintiff was fully functional despite his MS, and there was "no significant neurological focality, if any." (Tr. 31). Finally, in a finding dated September 2010, Dr. Reddy presented the results of a nerve conduction study which reflected evidence in Plaintiff of a mild early sensory peripheral neuropathy likely due to Plaintiff's diabetes, "mild to at best moderate carpal tunnel syndrome," and "mild less like moderate cubital tunnel syndrome." (Tr. 31).

The ALJ also noted that Plaintiff had not been entirely compliant with taking his medications, as evidenced by his progress notes from the Lee Davis Center. (Tr. 31). Specifically, on two dates (November 8, 2010 and February 25, 2011), Plaintiff had stated that he had not taken his medication on one occasion during the week. (Tr. 31).

The ALJ then turned to the determinations of the State Agency Disability Experts. (Tr. 31). As noted previously, Dr. Nancy Dinwoodie determined that Plaintiff's alleged mental impairments were not severe. (Tr. 318). Dr. Ronald Kline determined that Plaintiff could lift twenty pounds occasionally, ten pounds frequently, could stand and/or walk for about six hours in an eight-hour workday, could sit for about six hours in an eight-hour workday, and push or pull on an unlimited basis. (Tr. 356). Finally, Dr. Schilling stated that Plaintiff "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from any impairment." (Tr. 379). While these determinations were not binding, the ALJ found them "generally persuasive." (Tr. 31).

Finally, the ALJ acknowledged that, in 2004, neurologist Dr. Kamat, Plaintiff's treating physician at the time, stated that Plaintiff was "temporarily disabled for any gainful employment." (Tr. 31). The ALJ further acknowledged that Social Security Regulations and SSR 96-2p provides that the ALJ "must consider the opinions of record and that controlling weight must be given to the medical opinion of a treating physician if it is well-supported by medical evidence and if it is not inconsistent with other substantial evidence." (Tr. 31). However, the ALJ asserted that, despite the opinions of such physicians, the ALJ is the ultimate arbiter of work capacity for Social Security purposes, and as such, the determination of "disability" is reserved to the Commissioner. (Tr. 31-32). Thus, a physician's opinion is not controlling in the absence of supporting evidence of an objective nature. (Tr. 32). In light of this, the ALJ held that it was unclear from Dr. Kamat's records whether Dr. Kamat was familiar with the definition of "disability" within the Social Security Act when Dr. Kamat defined Plaintiff as "temporarily disabled". (Tr. 32). The ALJ noted the possibility that Dr. Kamat was merely identifying Plaintiff's inability to continue Plaintiff's past work based upon Plaintiff's present condition at the time, (Tr. 32), a reality which does not speak

to the requisite Social Security determination under step 5 of the sequential evaluation process of whether or not there are jobs in the national economy which Plaintiff can complete. (Tr. 23). In addition, the ALJ noted that Dr. Kamat's opinion was inconsistent with the findings of Dr. Reddy, who stated that the Plaintiff had experienced no exacerbations of his MS, and Plaintiff was fully functional despite his MS. (Tr. 32). Thus, the ALJ held that relevant evidence failed to support Dr. Kamat's opinion, and thus, the ALJ afforded little weight to Dr. Kamat's opinion. (Tr. 32).

The ALJ then concluded by asserting that the ALJ's determination is supported by the medical evidence, and while Plaintiff expressed multiple complaints regarding his condition to various doctors, his condition would not preclude all work activity. (Tr. 32). The ALJ found that Plaintiff's assertions and claims regarding his symptoms were not entirely credible and not fully supported by the medical evidence of record. (Tr. 32). Since the Plaintiff had been diagnosed with MS in 2004, he had experienced no exacerbation of symptoms related to his impairment. (Tr. 32). While the Plaintiff had also been diagnosed with diabetes, Plaintiff's medical records showed that he had received only conservative treatment for that impairment with no evidence of hospitalization. (Tr. 32). The Plaintiff had also been diagnosed with major depression, but the medical record once again showed little treatment for that impairment, and the medical record did not contain any opinions from treating or examining physicians related to his depression that Plaintiff was disabled or had any limitations greater than the ones determined in the ALJ's decision. (Tr. 32).

In light of the above, it is clear that the ALJ's opinion was based on substantial evidence because the evidence cited by the ALJ was relevant evidence that a reasonable person would accept as adequate to support the ALJ's conclusion. *Foote*, 67 F.3d at 1560. First, the evidence cited by the ALJ not only supported his opinion but was also drawn from a variety of medical sources. In

addition, in specifically addressing Dr. Kamat's opinion that Plaintiff was "temporarily disabled" in 2004, the ALJ's assertion that Dr. Kamat's opinion lacked the necessary context to understand it for the purposes of determining Plaintiff's "disability" for Social Security benefits was reasonable, as was the ALJ's conviction that Dr. Kamat's opinion further lacked reliability in light of its inconsistency with the determinations of other physicians of record (most notably, Dr. Reddy). (See Tr. 31, 385).

Finally, it should be noted that, during the hearing, the ALJ presented Joyce Courtright, a vocational expert, with a hypothetical based on the ALJ's findings with regards Plaintiff's medical records. (Tr. 61-64). Based upon the information supplied to Ms. Courtright, she determined that Plaintiff possessed the capability to engage in the following jobs: assembly, wrapping and packing, and verifying and recording. (Tr. 63). However, Plaintiff attempted to alter the hypothetical by adding the following restriction to Plaintiff's capacity to work:  Plaintiff could not engage in any work-related tasks that required fine manipulation. (Tr. 64). In response, Ms. Courtright stated that such a further restriction would rule out Plaintiff's ability to perform the assembly and wrapping and packing jobs while limiting by 50% his ability to perform the verifying and recording jobs. (Tr. 64). However, the determination of whether or not the ALJ had based his decision upon substantial evidence does not permit the inclusion of such a further restriction into the hypothetical. The sole question at issue is whether or not the information that comprised the hypothetical, supplied to Ms. Courtright by the ALJ, was supported by substantial evidence. If that information supplied by the ALJ to Ms. Courtright had included the inability to perform tasks involving fine manipulation, then perhaps Ms. Courtright's determination that Plaintiff could perform the above three jobs would be in error. However, based on the ALJ's findings, the Plaintiff was not restricted in the area of fine manipulation, and this determination is supported by substantial evidence from

Plaintiff's medical records. While the records attest that Plaintiff experienced numbness and tingling in his hands, (Tr. 231, 247, 306, 381, 400), and that Plaintiff was diagnosed with carpal and cubital tunnel syndrome by Dr. Reddy, (Tr. 14-15, 384), regarding the latter Dr. Reddy asserted that Plaintiff suffered from "mild to at best moderate carpal tunnel syndrome" and "mild less like moderate cubital tunnel syndrome." (Tr. 384). Furthermore, Dr. Rosenthal's May 25, 2010 examination of Plaintiff's hands established that they were within normal limits. (Tr. 307). Thus, substantial evidence exists to support the ALJ's decision not to include Plaintiff's inability to perform tasks involving fine manipulation within the information presented to Ms. Courtright as a hypothetical for her assessment.

### IV. Conclusion

The ALJ's decision in the instant case is supported by substantial evidence. The ALJ did not err in his evaluation of Plaintiff's credibility and reasonably determined that Plaintiff was not disabled based upon the Social Security Administration's five-step sequential evaluation process.

**IT IS HEREBY ORDERED:**

1) The final decision of the Commissioner is **AFFIRMED** pursuant to 42 U.S.C. § 405(g); § 205(g) of the Social Security Act.

2) The Clerk is directed to enter judgment for the Commissioner and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on February 13, 2014.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record